Good morning, your honors. My name is Jack Tucholsky, and I'm... You may want to lower that lectern a little bit, so there's a microphone. I think there's a... something... Down would be good. There you go. Good morning, your honors. My name is Jack Tucholsky, and along with Sarah Peters, my co-counsel, we represent the appellants in this case. I'd like to reserve five minutes of my time for rebuttal. Every district court that has looked at executive orders says they contain mandatory duties. The district court here ruled that the executive orders at issue... How can we enforce executive orders? There are directions from the president to his ordinates, and it strikes me as a totally intra-branch dispute. I don't see how the judiciary can get involved. Well, first of all, your honor, that issue is not on appeal. The government didn't appeal that rule. It's always on appeal. It's a jurisdictional question. It's a question of authority of Article 3 courts. We don't give advisor opinions. We don't render political opinions. Your honor, it's not a subject matter jurisdiction question. This case arises under the laws of the United States and under Article 3 and 28 U.S.C. 1349. It's a question of Article 3 power. We can't, for example, if the president wants to fire his secretary, secretary of state, or maybe his personal secretary, we can't intervene. Or if he wants to tell, give direction to the attorney general about how to conduct enforcement as a matter of policy, we can't intervene. Your honor, many courts have held that if the executive order comes from a legislative enactment of Congress, it is a legitimate exercise. How does it come from? Well, in this case, the underlying statute is the National Environmental Policy Act, which is the basis for the executive order. And does that give the president regulatory authority? It does. Specifically, the president? It gives the president, through the Council on Environmental Quality, to establish Well, the CEQ has regulatory authority, but an executive order is just directions to the staff. It's sort of like the president's order to the chef or the White House chef as to how to prepare meals for visiting dignitaries. This executive order is directed at federal administrative agencies that he supervises. But aren't there many executive orders that are enforced by private causes of action? There are a number of the executive orders that are enforceable, and then there are plenty that aren't. And the test is, does the executive order, because you're right, the president can't make laws. But if the executive order is based upon a law that Congress has passed, then it's considered to have enforceable laws. Or, in some instances, an interpretation of the Constitution. I mean, there are all the executive orders that dealt with discrimination even before Title VII and similar enactments, and they've always been enforceable in court from day one. Yeah, they are enforceable, and the district court held that this was enforceable. No, I'm sorry, you have cases that does that? The President Truman desegregated the armed forces. Are the cases enforcing that executive order? Does somebody go to court and say, under the executive order, I'm entitled to... I don't think so. The issue has not reached the Supreme Court. The Conservation Law Foundation in the First Circuit and in the Meatpackers case that the district court cited from the Eighth Circuit said that executive orders can create a private right of action and are judicially enforceable. And, in fact, every court that has addressed this executive order, every one without failure, has said that it is judicially enforceable. And, in fact, the government didn't appeal that issue because they knew the district court was correct. And so... No, they may have thought the district court was correct, but we're, of course, not bound by that. If it's a matter of arbitrary power, we're certainly not bound by that. Again, Your Honor... The issue has not been briefed before us, and if we want you to address it, presumably we would get briefed, and we wouldn't worry about it then. Look, can I just add to this discussion, how does the regulation fit into this, into Judge Kaczynski's concern? That is the 212.55. The regulation... And does that come from a different source of authority? No, no, it comes from the executive order. Derived directly from the executive order. It's derived from the executive order, and it's considered to be... And who promulgated that? The Forest Service. And did they do it through classic rulemaking authority? But the Forest Service has other authority. Even if one looks at the executive order as a directive to the agency, the agency, in fact, issued a regulation. Now, you have problems with the regulation. That's right. But there is... But the government's position is, we didn't interpret the regulation here the way you're complaining about it. But there is an underlying regulation. That's right. Aside from the executive order. Right. And they work in tandem, and the courts that have addressed them have said, under the executive order and the regulation, the obligation on the federal government to minimize impacts on... But I have another set of problems. Okay. What does it mean to minimize impacts? I mean, does minimize mean make it as small as possible, make it less than it was before, make it less than something else? What does it mean, and how do you administer that? It means that, on the record, that the government has to take a look at the place where it is allowing motorized use and take reasonable measures to minimize the impact. To what? To make it less? To make it less. Yes. To make it less. Not the least possible, but less. Make it less. Yeah. Less than what? Less than it was before, less than it might otherwise be, less than somewhere else. That would be within their discretion, and that's the problem here is that the record here is completely silent. The environmental impact statement doesn't once mention the executive order or the regulations or show how opening 2 million acres to motorized use was done with an effort to minimize. But the appeal does. The appeal does discuss it some. Pardon? The appeal document does discuss it some. It discusses it in cryptic terms. But if you go back to the record, let me give you an example. They say the Forest Service cites to the ‑‑ this is in the administrative record at AR tab 5, table 179. The government says, well, here, we minimized impacts from snowmobiles. And if you look at the record, the chart is about summer impacts. And so then the government says, okay, court, you need to draw some inferences here because there is not one sentence in this record that says how this chart is relevant to minimizing impacts in the wintertime because the information is only about summer impacts. Well, they have charts about the winter, and it certainly shows that it's a lot less open than it was before, and it shows that it's less open than some of the other possibilities. I'm sorry, what? That's true, Your Honor. Right. But if you look at the charts, simply because they have some information that says that it's less than before, that doesn't show how they've minimized where they have actually ‑‑ Less than they had six options, and this was less than almost all of them. That's why I want to know what minimize means. I don't get it. Minimize means that if you're going to allow winter motorized use, that you have to have some basis in the record to say, okay, we looked at the snowmobiles here. We looked at the resources, elk, cross-country skiers, whatever, and we have located these areas or these trails in such a way that it will lessen the impacts, and they have discretion to define what that is. We're not asking this court ‑‑ So they just do that on an area by area basis, or the whole ‑‑ Area by area is how they broke it down, and we don't disagree with that. They have the discretion to decide on what scale they're going to apply these, but they have to have ‑‑ How do they define the areas? I mean, just where they ‑‑ By mountain ranges on a landscape level. They define the area by mountain ranges, and we don't have any dispute with that methodology, but if you go look in the record at each of the things they say shows that they gave a rational consideration to how they would minimize these, the data doesn't support it. As I said, it's either about summer use or it's just a table saying, well, there's less now than there was before, but that doesn't show how for the areas that they have left open, which are 2 million acres, how they have made any reasoned consideration as to how that they would minimize impacts, and that's the problem we have. This is not about banning ‑‑ Are you maintaining ‑‑ as to the amount of open areas, or is it as to how they're regulating the areas in which snowmobiles are allowed? I mean, I suppose they could say, you know, only so many snowmobiles a day, or they could say only certain kinds of snowmobiles, or they could say only snowmobiles in the morning. I mean, is that the kind of thing you're looking at? Exactly. That's exactly, that would show that they looked at the specific resources that are affected, and they said, okay, we're going to implement some, and we see a conflict here because that's what the regulation goes to, it goes to conflicts, and so we can lessen or minimize this conflict by, yes, snowmobiles in the morning, or none after March 1st, or whatever, and there's nothing in this record that shows that they even took that basic step, and that's the problem we have with the Forest Service's approach here, is that there just isn't anything in this record to support that. I mean, is part of the problem here that this decision‑making process is a forest‑wide process, whose function really was just to graph out general areas, and there's more to come, in fact, more has come. There is no more to come in terms of opening two million acres to motorized use. Well, except they do monitor it and can put a stop to it if they see that there are impairments. This is not like building a road or felling a redwood or something like that. They allow the use, and they're supposed to keep an eye on it, and if they see that there is adverse effects, they can stop it. They can, but that's not what the executive order and the regulation requires. It requires that at the time they make the decision, and no one disputes that they made this decision and there's no required decision to follow, at the time they made the decision, they didn't even provide any information as to why these specific areas should be open in light of this obligation. But it does matter because it depends on the kind of action. If it's a kind of action that is inherently irreversible, you can't put a stop to it. Once you cut down a redwood, I don't think you can put it back up again. Whereas if you allow certain uses and you have a continuing monitoring process, the degree of certainty you need to have about it is less because you can stop it. You can monitor it, you can watch it, and you can undo it. Okay, let me contrast what they do for summer motorized use, motorcycles and ATVs, where they have this second layer of analysis, and that's what the executive order and the regulations provide for. And so they go through that much finer process, but they don't do that for snowmobiles because they've crafted a regulation that is completely at odds with the executive order. Let me just clarify something, going back to the original question. You talk about the executive order and the regulation. To what extent do you rely on the regulation alone and to what extent on the executive order? If you were to take away the executive order, because the regulation is primarily for a service and it has its own authority derived from various statutes to primarily get regulations. Which regulation are you talking about and to what extent are you relying on the regulation and to what extent are you relying on the executive order? Okay, the executive orders are in place and in response to that, the Forest Service established a regulation back in the 1980s, 36 CFR 295, that said for snowmobiles and for motorcycles, you have to do this site-by-site analysis to minimize. And we were fine with that regulation. In 2005, they passed a new regulation without any detailed explanation and said, forget about snowmobiles. You don't have to look at snowmobiles if you open areas. And so the regulation now is at odds with the executive order. But the government here insists that either in general they don't interpret it that way or at least they didn't interpret it that way here. So how can we doubt that? I mean, why don't we just use the regulation as they are claiming it reads, which as they're claiming it now, they may say that differently in another case. I think they have said differently in other cases. But as they're saying it here, they are not denying that it applies to the snowmobiles with regard to the question of determining which are open and which are closed. So we have a regulation. It governs it. I understand you have a problem with the regulation, and I understand why you have it. It's certainly worded weirdly, and I've even looked at the legislative history. There's some support for your reading, but they're not doing it here. They claim they're not doing it here. And they're wrong about that. And, again, go back to the record. They're not going to defend it on that ground if they're not defending that interpretation. How can we – why don't we just take them at their word and judge it against the interpretation they say they're applying? Because that's not the interpretation they're applying, Your Honor. They say they are. In this case, they are. They have not said that even though the regulation exempts snowmobiles, that we are going to go back and look at – Well, first of all, it doesn't exempt them. But what does it say it exempts? Subpart C exempts the Forest Service from going through the minimization criteria when they open areas for motorized use. Even if you read it that way, they're saying we didn't read it that way, and that's not what the appeal document does. And we're willing to be judged against the regulation the way you're reading it, essentially. And then I would say go back to the record and – But why do you want to do this? Why don't you want to take them for what they're saying? Because they didn't do what they're saying. Good. Then they lose. But I don't understand why you want to take the position that the regulation means something worse than they're saying it means. Well, because, you know, the regulation applies nationally. Right. Okay. And that's another case. It's not this one. Right. And, in fact, that case is pending in front of this court. Fine. But it's not this one. Okay. So, you know, I will concede that, Your Honor. And if we take them at their word, if you go back to the record and look for the places where they've said they have analyzed and minimized the areas that they've opened to snowmobile use, you won't find any support in the record. And what the district court said and what they said in their brief on page 22 is, well, judges, you have to draw inferences from this record for us. You have to connect the dots between the data that we have in the environmental impact statement and the data and the obligation that we have now taken on to say that we're minimizing impacts. And I think with that I'd like to say. You've got about four minutes left. Let me hear from the government. Good morning, Your Honors. May it please the court, my name is Beverly Lee, and I represent the United States Forest Service. In 2009, the Forest Service issued the revised forest plan for the Beaverhead Deer Lodge National Forest after considering over 40,000 comments during the administrative process and after preparing an environmental impact statement that covers 1,400 pages. The Forest Service carefully balanced competing uses between recreational users and also effects on resources throughout the forest in arriving at its carefully considered decision. Plaintiffs have raised issues concerning this revised forest plan under the National Environmental Policy Act, the executive orders governing travel management, and they also claim that they have a claim against subpart C of the travel management regulations. In light of the court's questions to Mr. Tucholsky earlier, I'd like to start with the enforceability of the executive order question just to briefly lay out the government's position. As we've articulated in our brief, the government is not appealing on this issue, and we do believe that the district court got it wrong below, but this issue as a technical matter doesn't have to come before the court because of the travel plan. Which is this issue? The issue of whether the executive orders are privately enforceable as a practical matter because we do have the travel management regulation that the department promulgated, which also has a minimization criteria. I realize there's a question you didn't appeal and whether the issue is before us if you didn't appeal, but what was the government's position as to the enforceability of the executive orders? Our position was that they should not be privately enforceable. Because these kinds of executive orders are never enforceable because this particular one isn't enforceable. The question turns on each executive order. So you're not taking the position that an executive order providing directives to subagencies is per se not an enforceable directive. It's just a question of whether it meets the general requirements for private enforcement. Correct. Whether it was intended to be private enforcement. Correct. But in any event, your position is we don't need to reach that issue because there's a regulation. Yes, there is a regulation, 36 CFR 212.55, which lays out the minimization criteria. And what is 355 based on? What is the agency's authority for the regulation? It's based on NEPA and... So it derives, the agency issues a regulation using its authority that Congress delegates it under NEPA, right? Correct. You said and? Maybe there was... A fulfillment of the executive order. A fulfillment of the executive order, but the authority for it is from NEPA. Correct. So it derives from Congress, not from the presidential executive order. Yes. And they follow the administrative procedure, notice and comment. Yes, that's correct. But, so then the question is, there seems to be a disagreement as to, but potentially in some other cases as to what this executive order may mean, it is strangely worded because there was a separate provision with regard to smell abuse. But my understanding is that the position you're taking in this case is that snowmobiles are no different than other over-the-road vehicles with regard to what the minimization requirement is, but it was met. Is that basically your position? Basically, I would clarify that there is a bit of a practical difference between the summer motorized use and the over-snow vehicle use. And the district court below also pointed this out in that for the areas designated for motorized over-snow use, there is not a requirement that the vehicles stay on a particular route. And in the summer, the way the designations work. But in terms of your interpretation of the regulation, I mean, you're willing to have yourself judged for purposes of this case. The facts may be different, but the standards are not different with regard to other over-the-road vehicles and snowmobiles. Is that basically right? We believe that for the over-snow vehicles, as the Forest Service conducted its analysis in this case, that using the area approach and the level of analysis that it did provide for these areas was appropriate. And that may be different when. But that it did have a minimum. The difference seems to be whether you had a minimization requirement, whatever our minimization requirement is, with regard to the decision of whether to close as well as the way in which you regulate if you are restricting. And you're saying, yes, the minimization. You're willing to be judged by the assumption for the purpose of this case that the minimization requirement, whatever it may be, applies to the decision whether to open or close areas. Is that basically right? Basically, yes. Okay. Turning to the merits of whether the travel minimization criteria were considered, the record below does show that the Forest Service looked at these criteria. I'm sorry. I was thinking about your answer. So what you're saying is the applicable regulation here is 36 U.S.C. 295. No, it would be the Part 212 regulations, which superseded the 295 regulations. It is the Part 212 regulations. We're saying that for purposes of this case, the Forest Service designated snowmobile use areas and we followed the minimization criteria process laid out in 212.55, which requires the consideration of criteria. Okay. And the appeal decision shows this because it summarizes how the minimization criteria were considered. For example, with respect to Big Game, which is one of the resources plaintiffs have expressed concern about, the Forest Service described how there were limitations on over-snow vehicle use within Big Game winter range and also how there were closures to account for the fact that there was wolverine denning habitat in some of these areas. And as a broader matter, across the National Forest as a whole, these 3.3 million acres as a whole, about 60% is closed to over-snow vehicle use as a result of this decision compared to 84% being open before. And so we are implementing a decision that is improving on the status quo by closing more areas than before. The court found that the minimization was inadequate with regard to the routes but not with regard to the areas. What possible rationale? And then you went ahead and redid the minimization analysis with regard to the designated routes for snowmobiles. Yes. What possible difference could there be as to the methodology depending on whether it's a route or an area? I think it's a matter of scale. If you're talking about routes, you know exactly where the over-snow vehicle will be. It will be on a stretch of route that's five miles long from point A to point B. Okay. And with over-snow vehicles in an area, say you have a large basin in which people can recreate, for certain of those areas you can have an idea of the amount of use and the extent of the potential impacts on resources. But it's less concentrated. It's more spread out. But why should that make a difference as to whether you at least have to address each area and say something about why you didn't have less use for that area, less over-the-snow use for that area, or either because there weren't elk there or because there were other possible uses or something. I mean, if you're required, and there's other cases that hold this, to do some more lower level down analysis on minimization for routes, why wouldn't you have to do the same thing? But for the areas the way you've designated the areas. No one's telling you to take a different area, but the areas the way you've used them. The area analysis is different because the scale of how big it is is different than for a route. You have perhaps 30,000 or 100,000 acre area, and these are a landscape type of designation, and plaintiffs have said that they do not contest our use of this landscape area. So what we're talking about is within these areas, how much detail do you need to provide? And throughout the EIS for this document, you can see that for each landscape area, there's extensive discussion about effects on wildlife, water quality, vegetation, all the factors that the regulation and the executive order lay out. It would be more on a general forest wide area rather than on an area-by-area basis when you look at the documents in the record. The specific portions of the record that deal with, for example, digging winter range break it down by area, and they talk about the effects within those areas. And so there's consideration as far as particular habitat, particular uses. Some areas are more popular than others, and so there's consideration about the amount of potential conflict. That's across the forest, correct? By area, there is analysis in the EIS regarding effects of oversnow vehicle use. It wasn't a conglomerate three million acre area that was considered. It was broken down across the landscape. By big game. So how about watershed or soil? How was that done? For watersheds and all the other resources, there's discussion at a, I believe it's also at a landscape level, talking about these oversnow vehicles, which are allowed to be used throughout a particular area and what the effects would be. Within each landscape area? Correct. There's that kind of discussion? Yes. Could you show me an example? Give me one moment. Just. If you can. Sure. I mean, I don't. In the supplemental excerpts of record, looking at tab nine, we can see about. . . You have a page number? Yeah, page 110. Page 110. Okay, hold on. Hold on one second. What's faster, the page or the iPad? I don't know. What are we looking at? What page? In the supplemental excerpts of record, page 110. It's SER 110, right? SER 110. Which has 479 at the bottom. 479 is the page in the EIS as it was. . . But our paper wins. And it talks about the effects of noxious weeds and. . . Ooh. We're now edging in a whole other area. I'm sorry. But vegetation is an issue that is within. . . Tell me where on the page you're reading. It's very small type, which I can't enlarge because I don't have an iPad. Is it below the. . . There's a title there that says effects of vegetation, right? Right. And it's in the next paragraph, right? No, no, it's at the top. It talks about winter motorized and non-motorized areas. Okay. And it talks. . . Oh, I see most noxious weeds. There we go. Right. It talks about how these winter vehicles could potentially transport seeds, but it's not likely to create a measurable effect. Why does that tell you about why in landscape area X you have such a percentage of closed areas, whereas in landscape area Y you have such a percentage of closed areas? And whether. . . I don't. . . Again, I have trouble with knowing what minimization means, but I suppose with regard to noxious weeds it would be something like, well, in this area there was no need to close more roads because the noxious weeds aren't going to be impacted or something like that. And perhaps this one is not the best example. I think for the big game it is clearer as far as. . . No, but I. . . Maybe this is a good example. What they're saying is it's not a problem. It's not a problem anywhere because these vehicles don't transport the seeds. I mean, this may be wrong, but that's what they're saying. So you don't have to look area by area because what it's saying is as to noxious weeds, these over-the-snow vehicles don't transport seeds. Right? Correct. But I believe Judge Paez's question was as far as where else can we find landscape by landscape area type of analysis for. . . With regard to big. . . And for big game we do have that. I mean, there is indications, and one would think that the areas differ with regard to the presence of big game. They do, and the EIS talks about by hunting districts, how much elk are within each of these hunting areas. Can you give us an example of that? Yes. In the supplemental excerpts of record, the next page over, 111, has a chart of the hunting districts, the amount of elk, and how they have. . . discusses how they have satisfied the Montana State's elk population objectives, and that discussion related to a situation under the status quo, under which fewer areas of the Forest Service were closed to snowmobile use, and so after the revised forest plan is implemented, even more areas will be closed. What's the baseline for the minimization? It's what was there before. It's what is possible now. It's what? What is it? It's not a model of clarity as far as how it's measured, and the courts that have addressed it have talked about how there is some policy underlying these executive orders asking the agency to arrive at a result that is less, and our understanding is that . . . I understand, but less usually means less than something. Right. If NEPA is the underlying statute, then it would be less than the baseline, presumably, which is the no-action alternative. So as long as you have . . . as long as you close something, you've made it? From a substantive perspective, but from a procedural perspective, as far as how the consideration has to happen, there does have to be discussion about each of the resources that are listed in the regulation. That's my other question. I couldn't quite tell what the . . . was the government's position that this is strictly procedural and the minimization . . . NEPA, we understand, is strictly procedural, but is the minimization requirement only a requirement that you consider something or does it have a substantive component as well? We believe you have to consider it, and there has to be an effort to move towards the objective of less than . . . There is something you have to do. You can't do nothing. Correct. And you have to show how you've considered it. And some substantive component. That assumes that, in fact, the executive order provides a separate base of authority. Since the regulation is promulgated on NEPA, and NEPA is entirely procedural, if you simply look at NEPA as the base of authority, then all you have is procedural statute. Then if you give a different answer, you say, well, the executive order now imposes a substantive requirement on the agency. And it gets us back to the question I had as to whether or not executive orders are judicially enforceable. I'd agree with the judge's . . . But is NEPA really the only basis for it? I mean, isn't it? Or why are you telling us that NEPA is the only basis for it? I think the reason I ask the question is because that's the first question I ask. No, no, I know that. No, I'm asking . . . Authority is NEPA. Maybe there's another basis. That's what I'm asking. I mean, for example, the Forest Act has substantive requirements as well. And EPA, the ESA has substantive requirements. So why is this regulation only implementing NEPA as opposed to some other environmental regulations? It's a . . . Statutes. It's a statute. It's an executive order that was implemented across different agencies and . . . No, but we're talking about the regulations. I asked you to begin with what is authoritative regulations, and you said NEPA. And I think what you're now saying is why is NEPA the only source of authority? Are there other sources of authority for regulation? Usually when agencies implement regulations, they give us a source of authority. What authority are they exercising? Do we know? Did they say what authority . . . Did the Forest Service tell us what authority they were exercising in promulgating the regulation? I believe it's NEPA. I would double-check on that question. They would tell us, right, at the beginning. They said we are exercising our authority. Right. Even if it has other sources of authority, if it doesn't list them, the regulation can't be implemented there, can it? Correct. But the executive order is a NEPA-dependent executive order. I understand. That backs us into the question of whether or not the executive order can impose binding or can grant authority to the agency or bind authority. That's a question which you haven't raised, but which nevertheless is lurking in the background. Yes, Your Honor. But just to . . . As far as you know, the agency did not exercise any other basis of authority, any other statutory basis of authority in promulgating this regulation. For the regulation, the Forest Service is given authority to manage federal lands, and that would be under the National Forest Management Act. It's certainly true, but we're talking about the regulation. Does the regulation . . . Regulations are promulgated under a grant of authority. Agencies can't just come up with regulations. And they usually say . . . And you don't know off the top of your head whether or not in promulgating this regulation, the Forest Service exercised any other authority than NEPA. Not off the top of my head. Okay. I'll reserve the other time for an intervener. Counsel. Who? You're wasting a lot of time. Okay. We'll round it up to four minutes. Thank you. I just want to touch a couple of key points. There's a big elephant in the room I want to reveal about Subpart C, in quotes, snowmobile exemption. People haven't referred to me that way in years. That's been stricken by another case. It no longer exists. If I were in your position, I wouldn't want to expend a lot of energy trying to parse through the argument as to why there was even a right challenge to that regulation here. It's basically gone. So as Judge Berzon pointed out, the minimization question focuses on whether or not the agency adequately fulfilled its duties here. What case is that? It's not a Ninth Circuit case. It's a district court case. It's a district court case. Winter Wildlands Alliance. It's a district of Idaho case. Is it on appeal or not? It's on appeal. I represented some interveners in that case. We filed an appeal. The government has not. Realistically, the case will not get decided before the new regulation comes out. But the government, I mean, is entitled to tell us what they thought they were doing here, and they told us what they thought they were doing here. Right. Consistent with the fact that they didn't appeal this other case. It's my argument in the district court, and then they picked it up on appeal. But it's not right here because they didn't invoke the fact that they did. Right. If it's a question that's not here, they didn't do it. Right. Because they did the snowmobile analysis. And so now the question is, did they fulfill the minimization duty? And I want to stress. Under the regulation. That's my reading. And no circuit court has ever spoken on this question. And I beg of you to give us some guidance. What's the question? The question of all the questions that you have cogently asked. What's the level of analysis? Two big issues. What's the level of analysis? And what is the level of explanation that's necessary? Because the district court and magistrate decisions we are getting, and there are now more and more of them, one issued on Monday from Utah, they essentially want this spreadsheetd out on a route by route and a resource by resource basis. And when the agencies are failing to do that. But the route issue was out of this case because the district court essentially said that also. And I don't know if the district court, I never looked at what the agency produced, but they produced something they said was at that level of specificity. So we have this even more discreet issue, which is whether this same what you're calling a spreadsheet approach applies with regard to these broader landscape areas or not. Why would it be different? Is there any reason it would be different? Judge Malloy didn't give us a lot of guidance on that. I mean, we got one paragraph at the end of that section of the opinion. But I think it just said, as I read it, it essentially says there was no specific mention of the criteria with regard to routes. That's not true. It says areas and routes, doesn't it? Whatever it says, it does say different. With regard to minimization, there basically was nothing in the record that the court felt it could latch onto with regard to the route designations. The tables that Ms. Lee pointed out with the percentages of winter range. I see. So his point would be that the EIS does go through each individual area, for some purposes at least. And so it isn't that there's a different theoretical difference. It's just that this record does one adequately and the other inadequately. Correct. And that would be my view, is that the record must simply reflect that the factors were considered. Well, the government says that's not the requirement. There's more to it. Ms. Lee's statement of the requirement was acceptable to me. That they considered it and made some effort, I think, was the way she put it. Right. Meaning they did something. Right. And I don't dispute that. You're being very generous with me. So to the extent that I'm no longer helpful, please tell me. We're running out of time. Don't count the results. I'm completely out of time. Okay. Thank you. Thank you very much. Almost four minutes left. An eternity. Thank you, Your Honor. There is nothing in the record that shows an area-by-area analysis of impacts to wildlife, to cross-country skiers, to water quality. It just isn't there. They cite, for example, this table about elk numbers. On page 111, right? On page 111. And, you know, this is great for elk hunters. There's a lot of elk on the forest. But what this doesn't do is say, okay, and we've opened up snowmobiling on all these acres, and this is the impacts of that decision, and this is how we're going to minimize it. There is a part of the EIS that goes through each landscape area, right? It would be more helpful to me if you give me the page numbers in the EIS. So where is that? There is a part where it goes area-by-area. Your Honor, I'll give you an example here. The Lima-Tendoy Landscape Area on page 385 of the EIS. Okay. And, you know, it's on page 385 and 386, and there is no discussion in here about how opening, the percentage of this area that is open affects other resources. There just isn't any analysis in this section. They talk about- The charts that show for each proposed possibility how much is being closed in each area. That's right, and that's closure, and we have no debate over that. Our debate is when they open an area, that's where they have to apply the minimization criteria to justify it. And the closure is the opposite of opening. That's right, and so- When you're showing the percentage of closing, you're also showing the percentage of opening. Right, and what I'm saying is there's no analysis. A percentage is fine, but a percentage is not an analysis. It's not a discussion. That goes back to what you mean by minimization. If they demonstrate by their charts that there is, in each individual area, or whether in each individual area, there's less area open for snowmobiles than there was before and less than there would be with other alternatives, I mean that is one possible way, one interpretation of minimization that would meet, right? It is, and then I would go back to the district court in the Guzman case, and in the Center for Biological Diversity case that we cite in the briefs, where they say just showing the percentage is not enough, that you have to have some analysis as to why the percentage that you leave open reflects an application for this decision. It's not a comparison of the previous decision to the one they're making now. That's why I keep trying to- So what are you comparing it to? Minimize with regard to what? If they did an analysis and said we have minimized the impacts of snowmobiles when we have opened these acres to snowmobile use, it would be- Tell me what, if this happened in other cases, sort of give me an example of what a discussion like that would be. The Forest Service or the BLM did the same thing. They put out percentages and said, well, in the past we had X percent open, but now we have less, therefore- They didn't really say that. They said, and we considered doing it this other way, but that would have had more open areas in this area, but we're going to do it less. Right. Now what else are they supposed to say? They have to give an explanation for the decision that they do make- Meaning we're going to kill three more elk, but even though three more elk are going to die this way, we needed to do that because there's competing use by cross-country skiers? I mean, what were they supposed to say? They are supposed to- I mean, if they had done the analysis, then I would be in a much more difficult situation, but my point is that there is no analysis in the record to show for the areas that are open how they have considered and minimized. I think they have a lot of discretion, and I agree with Paul Turk that we need some guidance here, but all I can rely on is the district courts that have looked at this issue, and they have all said just putting out coarse percentages does not meet this duty, because as you said, Your Honor, it's substantive. It has some teeth here, and because it has some teeth, the burden is on the agency to show how it is minimizing, and that's really the nub here in terms of- Thank you. Patrice, how are you? Stand submitted. Thank you, Your Honor.
judges: Kozinski, Paez, Berzon